GREEN POINT SAVINGS BANK, Appellant-Respondent, v LITAS INVESTING CO., INC., Respondent-Appellant

On March 30, 1983, the plaintiff as purchaser and the defendant as seller entered into a contract for the sale of a parcel of property in Brooklyn, New York, for the price of $980,000. A $7,500,000 blanket mortgage on this and other parcels of land owned by the defendant was held by the estate of Frederick W. I. Lundy at the time. This mortgage was then assigned to the Kasa Lithuanian Federal Credit Union (hereinafter Kasa). The parties agreed that the closing on the subject property would be scheduled for December 30, 1983, with time being of the essence. The defendant was to convey clear and marketable title to the premises. On April 8, 1983, an architect, Algis Gudelis, a party unrelated to this action, filed a mechanic's lien against the premises in question and other properties owned by the defendant for labor allegedly performed by him pursuant to a contract with the defendant, which the defendant failed to pay. On or about August 4, 1983, Gudelis commenced an action in the United States District Court for the Eastern District of New York against the defendant based on this contract, seeking to impose a constructive trust on various properties owned by the defendant. On November 28, 1983, the defendant obtained a $2,600,000 loan from the Anchor Savings Bank (hereinafter Anchor), secured by a blanket mortgage on various parcels of

land, including the one to be sold to the plaintiff, and other parcels which had been mortgaged to Kasa. On this same date, Kasa agreed to subordinate its mortgage on these properties to the Anchor mortgage. The Anchor mortgage provided for the release of specific parcels of land from the mortgage lien upon payment to it of the "entire balance price less the sums required for legal expenses and brokerage" for such parcels. On November 30, 1983, and December 6, 1983, the defendant wrote to Kasa, requesting a release of the parcel to be sold to the plaintiff from Kasa's blanket mortgage. On December 10, 1983, Kasa agreed to release this parcel upon payment of $750,000. The defendant admitted to using the bulk of the proceeds of the Anchor loan to pay off a $750,000 mortgage held by an unrelated party on an unrelated property, to pay $1,160,387 toward Kasa's blanket mortgage in consideration for Kasa's agreement to subordinate its mortgage to the Anchor mortgage, and to pay $550,000 toward real estate taxes and other debts. It retained $130,000 "for much needed working capital". No portion of the money was set aside or used to obtain a release of the premises in question from either the Kasa or Anchor mortgage liens. The defendant's "expectation" was that the purchase price would be used to obtain a release of the premises from the Anchor mortgage, and that Kasa would release the premises from its mortgage *"without consideration"* (emphasis added). On December 30, 1983, the defendant refused to close. It now argues that it was "unable" to do so due to events beyond its control which prevented it from conveying clear title in accordance with the contract, thereby limiting its liability to a refund of the plaintiff's deposit. These events consisted of the imposition of liens against the property, i.e., the Gudelis mechanic's lien and constructive trust claims, and the Kasa mortgage, which the defendant had insufficient funds to satisfy at closing. We disagree with the defendant's argument.

Although the mechanic's lien purports to include the premises in question, the described services on which it is based were performed for *other* properties owned by the defendant. Thus, only these other properties were affected by this lien (see, Lien Law § 3).

Similarly, a close reading of the constructive trust claims asserted in Gudelis's complaint reveals not only that the services for which Gudelis seeks compensation were performed on properties other than the one at issue at bar, but also that the request to impress a constructive trust did not include the property in question.

In any event, the mechanic's lien permanently expired on March 30, 1985 *(see,* Lien Law § 17) and the Federal action was settled on August 4, 1986. Thus, even if these liens constituted defects in title at the time, they have since been removed and are no longer obstacles to the conveyance of a clear title or bars to specific performance.

As for the Kasa and Anchor mortgages, it is settled that a seller of real property may not, after contracting to sell, voluntarily encumber the property to the purchaser's disadvantage, and then shield itself from performance by claiming an inability to convey clear title due to such encumbrances. The defendant herein had a contractual obligation to discharge liens against its property and convey clear and marketable title *(see, e.g., F & F Rest. Corp. v Wells, Goode & Benefit,* 61 NY2d 496; *Levy v Lacey,* 22 NY2d 271, 276; *Stern v Gepo Realty Corp.,* 289 NY 274, 277). Had it not taken out the Anchor mortgage and loan, the defendant could have easily satisfied the Kasa mortgage lien with the proceeds of the sale *(see, e.g., Check-Mate Indus. v Say Assoc.,* 104 AD2d 392). Since the defendant voluntarily took out the Anchor loan and mortgage, it could not, in turn, use the proceeds of this loan to pay off unrelated debts and mortgages, and now claim that it was "unable" to discharge all liens on the premises at closing due to insufficient funds. We see no establishment of considerable hardship preventing the defendant from raising the money to pay off the second mortgage lien on the premises and conveying clear title to the plaintiff in accordance with the contract *(see, Da Silva v Musso,* 53 NY2d 543, 548-549). Accordingly, specific performance of the contract of sale is ordered. Thompson, J. P., Weinstein, Rubin and Spatt, JJ., concur.